Angel BURGOS FUENTES, and His Wife, Maria V. Otero, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 539–83T.

United States Claims Court.

Dec. 29, 1987.

As Corrected Jan. 6, 1988.

Orison Trossi Orlandi, San Juan, P.R., for plaintiffs.

George L. Hastings, Jr., Washington, D.C., with whom was Acting Asst. Atty. Gen. William S. Rose, Jr., for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

### I. *Introduction*

On or about May 30, 1980, plaintiffs, Angel Burgos Fuentes (Burgos), *et al.*, filed a mandamus action in the U.S. District Court for the District of Puerto Rico. They sought to compel the officers of the Internal Revenue Service (IRS), *et al.*, to correct certain disabling defects that rendered unrecordable a deed to property situated in Santurce, Puerto Rico. Said property was purchased by plaintiffs at a tax sale. In their request for relief from the perceived injury, plaintiffs sought in the District Court a refund of the $15,000 in cash that they had paid for the property at the tax sale. Further, in that original action, plaintiffs also sought other damages. The other damage claims, however, were all later dismissed by the court due to a finding of sovereign immunity. The District Court, in September 1982, held for plaintiffs, nevertheless, and ordered a refund of the $15,000 sales price. That court took this action because by the time of its decision, *supra*, the property had been resold (May 28, 1981) in a mortgage foreclosure sale instituted by the first mortgagee in the Superior Court of Puerto Rico. However, on appeal the U.S. Court of Appeals for the First Circuit, on or about June 1, 1983, vacated the District Court's opinion, for lack of jurisdiction, and remanded said case with instructions that it be transferred to the United States Claims Court. Accordingly, and following thereon, the record was so transferred from the U.S. District Court of Puerto Rico on August 26, 1983. On November 2, 1983, a com-plaint was filed in this court by plaintiffs, Angel Burgos Fuentes, and his wife, and Ignacio Hance Pizarro, and his wife.[1] In said complaint, plaintiffs seek a refund of the $15,000 in cash that they paid for the real property to the Internal Revenue Service at the tax sale, other specified damages, lost profits, and legal fees. Subject matter jurisdiction is properly here pursuant to § 1491(a), Title 28 United States Code.

The trial of the issues herein was held in San Juan, Puerto Rico, from October 2 through 4, 1985. The record shows that plaintiffs—paid $15,000, in cash, to purchase a delinquent taxpayer's interest in encumbered realty which was sold by the IRS at a tax sale *subject to* certain mortgages; following said purchase failed to curtail the encumbrances; and as a consequence lost the property due to foreclosure by the first mortgagee. Plaintiffs now seek the aforesaid relief on the grounds that the Service failed to comply with federal and local law. For the reasons particularized hereinafter, the court finds for the defendant.

### II. *Facts*

At the trial on the merits, four witnesses testified in behalf of plaintiffs: Mr. Burgos, Mrs. Burgos (Maria Otero), Ms. Mendez (attorney and notary), and Mr. Cardona (attorney and notary). Defendant called only the two Revenue Officers, *i.e.*, Mr. Milton and Mr. Pacheco, who were involved in the seizure and the resulting tax sale. The court finds the operative facts adduced at the trial to be as indicated hereinafter and no *separate* fact findings are being filed pursuant to RUSCC 52(a).

The undisputed background facts in this case are summarized hereinafter, while the facts in controversy shall, for the most part, be ventilated in the discussion, *infra*. On September 17, 1976, Mr. Burgos pur-

---

1. Pursuant to a verbal motion of plaintiffs' counsel made at the conclusion of the trial in this court, that the complaint in the names of Ignacio Hance Pizarro and his wife, Monica Alvarez Hance, be dismissed, said motion and ruling, as allowed, was memorialized by an or-der dated October 9, 1985, granting said motion with prejudice. (Plaintiff Fuentes testified that Ignacio Hance Pizarro died in either 1980 or 1981 which was two to three years *prior* to the filing of the complaint in this court.)

chased at auction the *interest* only of the delinquent taxpayer, Benjamin Muniz Medina, who was then married to Aida Mendez, in a parcel of real property (registered in favor of the husband and wife conjugal partnership) located at 250 Progresso Street in Santurce, Puerto Rico, and paid therefor $15,000. Mr. Burgos was the only bidder at the tax sale, which was held at the sight of the property. The interest in the property of Mr. Medina had been previously seized by the IRS on August 19, 1986, to curtail certain of his delinquent payroll taxes, for the years 1970 and 1971. Said interest therein was seized in accordance with the Internal Revenue Code of 1954, 26 U.S.C. § 6331 *et seq.* At the date of seizure, there was only one tax lien against the property which was for Medina's delinquent federal tax liability in the amount of $2,258.54.

Immediately following the tax sale on September 17, 1976, which was held at the site of the seized property, Mr. Burgos proceeded to the Banco de Ponce (the bank) and procured a bank manager's check in the amount of $15,000. Revenue Officers Milton and Pacheco, who ran the tax sale, met Burgos at the bank, received the $15,000 check as payment in full of the purchase price, and in turn gave Burgos the Certificate of Sale as required by § 6338(a), 26 U.S.C. (*See* Pltfs' Ex. 1.)[2] A tax sale under the foregoing statutes allowed, in 1976, a 120–day redemption period which permitted the delinquent taxpayer to reacquire his property upon paying a certain minimum amount to the purchaser within that 120–day period. § 6337b, 26 U.S.C. In the case at bar, Medina permitted the 120–day redemption period to elapse. Because the property was not redeemed, the IRS forwarded to Burgos on or about March 18, 1977, a Quit Claim Deed which

purported to transfer title subject to any existing encumbrances to the property interest purchased by him at the tax sale pursuant to § 6338(b), 26 U.S.C. (Pltfs' Ex. 2).[3] Upon receipt of the Quit Claim Deed, Burgos sought to have Ms. Mendez, his notary and attorney, prepare the deed for appropriate recording at the Registry of Property in Puerto Rico. In furtherance thereof, Ms. Mendez performed a title search, as a part of this process, and confirmed two prior and existing mortgages against the property. The first and second mortgages were initially recorded at $19,000 and $20,000, respectively. In addition to the mortgages, Ms. Mendez also discovered certain technical problems with the Quit Claim Deed itself to the extent that they would allegedly render it *unrecordable* under Puerto Rican law. First, the seized and sold property had belonged to the conjugal partnership of Mr. and Mrs. Medina. However, the Quit Claim Deed recited, and the record so confirms, that *only* Mr. Medina had been given notice of the seizure and tax sale which, allegedly, is contrary to the Puerto Rican law of conjugal property, according to Ms. Mendez. Second, the Quit Claim Deed of March 18, 1977, did not certify the authority of the person purporting to execute same. Thereafter, Ms. Mendez notified the IRS of the urgent need to correct these defects so as to allow Burgos to record the deed. Following the elapse of nearly one year, plaintiffs had still not received a Quit Claim Deed correcting the alleged defects, *supra.*

Consequently, in February of 1978, Ms. Mendez again contacted the IRS regarding the alleged defects in the Quit Claim Deed. She was told, at this time, that the IRS needed an official statement of nonrecordability by the Registry of Property in Puerto Rico. Soon thereafter, on or about Febru-

---

**2.** 26 U.S.C. § 6338(a) provides in pertinent part: "In the case of property sold as provided in section 6335, the Secretary shall give to the purchaser a certificate of sale upon payment in full of the purchase price." Section 6335 is captioned "Sale of seized property" and is applicable to the foregoing property seized and sold herein. All cited statutes (local and federal) are those that were in effect in 1976 unless otherwise indicated.

**3.** Section 6338(b) provides: "In the case of any real property sold as provided in section 6335 and not redeemed ..., the Secretary or his delegate shall execute (in accordance with the laws of the State in which such real property is situated pertaining to the sales of real property under execution) to the purchaser of such real property at such sale, upon his surrender of the certificate of sale, a deed of the real property so purchased by him...."

ary 8, 1978, Ms. Mendez prepared the Quit Claim Deed for protocolization for submission to the Registry of Property.[4]

Also, on or about February 14, 1978, the IRS informed Ms. Mendez that the first mortgage on the property in question ($19,-000.00) was being foreclosed by the First Federal Savings and Loan Association of Puerto Rico (First Federal) with a public sale set for March 14, 1978. (Following the *tax* sale on September 17, 1976, the first mortgage was continuously curtailed *only* to December 1976 by someone other than plaintiffs. Thereafter, First Federal filed a foreclosure petition in the Superior Court of Puerto Rico on April 27, 1977, due to non-payment of the mortgage after December 1976.) Judgment on the foreclosure was entered on August 26, 1977. Prior to the foreclosure sale, however, Burgos sought to intervene therein on or about February 15, 1978, with the result that the local court stayed the foreclosure sale by its order of February 24, 1978.[5]

During this period, on or about March 17, 1978, plaintiffs received the second "corrected" Quit Claim Deed from the IRS, but it also was determined to be defective and non-recordable. (Pltfs' Ex. 4). Approximately three years later (on February 5, 1981), the local court entered judgment denying the intervention, reaffirmed its judgment of foreclosure of August 26, 1977,

and on May 5, 1981, said property was sold at a public auction pursuant to a writ issued to the Marshall. As a rationale for this decision, the local court found that:

It does not appear from the certification of the Registry dated August 5, 1977, submitted in evidence by plaintiff, or the certification of the Registry dated March 28, 1978 submitted by intervenors themselves with their opposition to the motion for summary judgment, that intervenors were or are the owners of the property in controversy.

First Federal was the only bidder at the *mortgage* foreclosure sale and, therefore, was awarded the property at foreclosure. As a result of the mortgage foreclosure having been concluded by the first mortgagee (because plaintiffs who acquired the property at the tax sale *subject to* the two mortgages did not make the mortgage payments), plaintiffs at that point were out $15,000 in cash plus the property previously purchased.

## III. Contentions of the Parties

### A. Plaintiffs' Position

Plaintiffs, in their concerted effort to obtain relief, make several contentions with regard to the efficacy of the Quit Claim Deed prepared by the IRS, and its recordability under Puerto Rican law, as well as a

---

**4.** Under Puerto Rican law, a deed to property situated within Puerto Rico, that is prepared outside Puerto Rico, must undergo a process referred to as "protocolization" in order to be binding in Puerto Rico. Protocolization is the process of authentication by which the private deed is elevated to the level of a public instrument. To enable the registrar to evaluate the efficacy of such deed and to determine whether it is recordable and binding in Puerto Rico, several things must occur: first, the deed must be certified to by a responsible official that it is what it purports to be; second, the authority of the official executing said instrument must also be certified to by a notary public; and finally, the signature of the notary before whom the document was signed must also be certified. (Tr. 106–107 and 119).

**5.** In plaintiffs' motion to intervene in the local court foreclosure proceedings, Mr. Burgos represented to the local court that he "proceeded to sell" the property at issue to Ignacio Hance Pizarro (Hance) and his wife on April 21, 1977.

Hance, allegedly, owned a business on the first floor of the property in issue and initially informed Burgos of the tax sale. However, in plaintiff's (Mr. Burgos) testimony before this court, he represented that he purchased the property to sell *to* Hance conditioned upon Hance's sale of two taxi cabs (Tr. 91–92), but that Hance died in 1980 or 1981 before the taxis could be sold (Tr. 94). The court therefore finds, on this record, that the proposed sale to Hance was never effectuated, thus at Hance's death Burgos, as against Hance, was the legal owner of the property at the time of the foreclosure intervention motion by Burgos. The court notes also that in plaintiffs' Memorandum of Law, dated March 10, 1982, supporting the complaint seeking a writ of mandamus in the District Court, plaintiff Burgos alleged that while he was given a note in the amount of $28,000 by Hance Pizarro they "were unable to sell the same [*i.e.,* the realty] to Ignacio Hance and his wife." The court finds no evidence of an executed deed transferring the property to Hance.

number of allegations of defects in the tax sale procedure itself. In substance, plaintiffs contend that the government is in breach of contract because it failed to give plaintiffs a valid recordable deed, per local law, after plaintiffs duly paid the full sale price of $15,000. First, plaintiffs allege that the Registry of Property rejected the Quit Claim Deed because it recited that the IRS notified *only* the taxpayer, Benjamin Muniz Medina, of the seizure and sale of the property in issue notwithstanding the fact that the seized property was held by the conjugal partnership of the taxpayer and his wife, Aida Mendez. As a result, argues plaintiffs, the Quit Claim Deed failed to show that both spouses received said notice as required by local law. That is one of the reasons, says plaintiffs, that the Registry of Property in Puerto Rico, under local law, refused to record the IRS Quit Claim Deed evidencing the sale to plaintiffs. Second, plaintiffs maintain that the first Quit Claim Deed, prepared by the IRS, was unrecordable since it did not appropriately establish the authority of the Treasury Secretary's delegate and other IRS personnel to seize and sell the property in question. Third, the Registrar also rejected the deed because it did not recite the facts evincing that the proper procedures of an auction sale were followed—specifically, that the edicts for an auction were published, and that creditors appearing in the Registry of Property received notice. Finally, the Registrar, by letter to plaintiffs' counsel, dated March 30, 1979, found that the second Quit Claim Deed, prepared on March 17, 1978, to include an assurance of the IRS representatives' authority, remained unrecordable because the Certificate of Sale of the property did not comply with the requirements of local law. According to plaintiffs' argument, since the deed was prepared outside of Puerto Rico, it would not effectively transfer title under Puerto Rican law unless and until it was duly recorded.

In addition to alleging a legally defective deed under Puerto Rican law, plaintiffs also make a number of arguments attacking the procedures of the tax sale itself. First, plaintiffs alleged that they did not receive notice, at the tax sale, of the *two* pre-existing encumbrances on the property because the IRS officers did not make available for bidders or post a notice of such encumbrances at the site of the tax sale. Second, they also violated regulations, say plaintiffs, by not fixing or announcing the minimum bidding price for which the property would be sold. And, finally, the sale procedures were defective because the defendant also violated its regulations by failing to apply the surplus proceeds from the sale to the then outstanding encumbrances against the property. The ultimate point being that had defendant properly applied the excess proceeds from the sale, there would not have been a foreclosure by the first mortgagee and a resulting loss by plaintiffs.

### B. Defendant's Position

Defendant counters the foregoing by averring that the tax sale was conducted substantially in accordance with the federal statutes and regulations governing tax seizures and sale. Moreover, defendant argues that neither statutes nor regulations required it to affirmatively give notice of any encumbrances on the property sold. Further, defendant contends that the proceeds from the tax sale were disbursed in accordance with federal statutes and regulations. Federal law imposed no duty, it says, to pay off superior encumbrances with surplus tax sale proceeds absent appropriate circumstances, not present here. Finally, the government argues that the revenue officers in charge of the sale had no legal duty to inform plaintiffs of the minimum sale price, established through the use of an IRS internal formula.

Focusing on the validity of the deed that plaintiffs received, defendant maintains that the deed was valid because the tax sale was conducted substantially in accordance with federal law. Additionally, the Quit Claim Deed recited the facts set out in the Certificate of Sale as required by federal statute and the IRS executed the Quit Claim Deed in accordance with Puerto Rican law governing execution of deeds. Further, defendant claims that the validity

of the Quit Claim Deed must be determined under federal law, not local law. Consequently, it is defendant's position that the government did not breach the contract of sale, but rather issued plaintiffs a valid deed in exchange for full payment of the sale price.

## IV. *Issues*

In ruling on the merits of plaintiffs' claims, the court must address the following issues: (1) whether the procedures applied at the tax sale complied with federal law, including notice of the seizure and sale, disposition of the surplus proceeds, and notice to bidders of prior encumbrances on the property and of the minimum sales price; (2) whether local or federal law governs the validity of the Quit Claim Deed; and (3) whether the nonrecordability of the Quit Claim Deed was the direct and proximate cause of plaintiffs' damages.

## V. *Discussion*

### A. The Tax Sale Procedures

Plaintiffs challenge the IRS officers' method of conducting the tax sale by raising three arguments: (1) defendant did not give notice to plaintiffs of existing encumbrances against the property; (2) defendant failed to apply the excess proceeds from the tax sale to the outstanding first mortgage; and (3) defendant did not announce the minimum bid price set by the IRS before the sale. In addressing these issues, the court finds that federal law governs the conduct of the tax sale to recoup unpaid federal taxes.[6]

First, plaintiffs claim that the government violated its regulations by not giving them prior notice of the superior encumbrances against the purchased property. Under federal law, there are no stat-utory provisions regarding the seizure and sale of property, within 26 U.S.C. § 6331 *et seq.*, that impose an affirmative duty on the Revenue Officers to disclose to the bidders any pre-existing encumbrances on the property before it is sold. Nor are there any regulations promulgated by the IRS that speak to the duty of the Revenue Officers handling the sale to make known such encumbrances. The only reference to a notice to bidders of encumbrances is included in an internal policy statement found in the Internal Revenue Manual for 1978 at § 5362.2(4). The pertinent language therein is as follows: "Form 2434–B Notice of Encumbrances Against Property Offered For Sale, will be used *when requested* to provide prospective bidders information that the Service has learned about encumbrances which have priority over the Federal Tax Lien.... However, the Revenue Officer should have enough completed copies to give a copy to any prospective bidder." (emphasis added). The language in the Manual is patently clear that this information regarding superior encumbrances will be made available *on request* and not as an affirmative duty of the agents officiating at the tax sale. Mr. Burgos testified, however, that he advised the Revenue Officer that he would purchase subject property so long as it had *no* encumbrances; that "this has to be a clean sale"; that he was not going to purchase any property on which there was a lien; and that Revenue Officer Milton did not show him any documents (*i.e.*, the Notice of Encumbrances).

In view of the evidence adduced at the trial, *i.e.*, the testimony of Revenue Officer Milton who ran the tax sale (Tr. 179, 186, 199), the completed Form 2434–B submitted into evidence as Defendant's Exhibit 2, and the corroborative testimony of Revenue Officer Luis Pacheco, the court finds

---

**6.** *See United States v. Manufacturers National Bank,* 198 F.Supp. 157 (N.D.N.Y.1961) (liens for federal taxes and provisions for their collection are strictly federal matters). The court notes that plaintiffs have sought to apply the provisions of local (Puerto Rican) law, that govern the procedures for foreclosure of a mortgage, to the sale of the property at issue. However, the court finds that application to be erroneous as

this sale was a levy, seizure, and sale for the payment of delinquent federal taxes, *not* a mortgage foreclosure. *See* 26 U.S.C. § 6331(b). The authority under this section covers the power to seize and sell property or property rights. *See also Tavares v. United States,* 491 F.2d 725 (9th Cir.1974) (no requirement exists that a judicial hearing be held before levy).

that—Officer Milton did in fact perform a title search and found two existing mortgages in the original amounts of $19,000 and $20,000, prepared Form 2434-B, Notice of Encumbrances Against Property Offered For Sale on which they were included, and made said form available at the tax sale of the property in issue. In this connection, Revenue Officer Milton testified that—while he does not remember a specific discussion with Mr. Burgos regarding encumbrances, it is customary to simply post or make the notice of encumbrances available at the place of sale: "I do know that this [Defendant's Exhibit 2] was made available" because when he (Milton) arrived at the premises he had said document in his possession and as a consequence stated—"I feel that I did do it." (Tr. 201, 246–47). Revenue Officer Pacheco, who assisted Milton, corroborated him in this regard in that he testified (at Tr. 265) that:

Yes Mr. Burgos asked if there was [sic] any encumbrances and he was informed that there were encumbrances by Mr. Milton.

With respect to the question of a governmental officer doing his duty, there is a well-established presumption that government officials perform their duties in a proper manner. *Sun Oil Co., The Superior Oil Co., and Marathon Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786 (1978) (plaintiff failed to rebut presumption of regularity in its challenge to U.S. Geological Service procedures for granting of oil drilling permits). On the record before the court, plaintiffs similarly failed to present credible evidence to overcome the presumption that Officer Milton properly prepared Form 2434-B and made it available at the site of the tax auction sale. Against this background, therefore, particularly the corroborative testimony of Revenue Officer Pacheco, the court finds that plaintiffs had and received legal notice of the prior encumbrances against the property *prior* to submitting the bid of $15,-000.00.

Second, plaintiffs allege that defendant violated federal statutes and regulations by not applying the excess proceeds from the tax sale, in the amount of $12,577.06, to the balance due on the first mortgage, which was initially foreclosed on August 26, 1977. Section 6342 of Title 26 U.S.C. provides that the proceeds of the tax levy and sale shall be applied first to pay the expenses of the sale, second to pay any tax due on the seized property, third to pay the tax liability of the delinquent taxpayer for which the property was seized, and fourth any remaining surplus proceeds "shall, upon application and satisfactory proof in support thereof, be credited or refunded by the Secretary ... to the person or persons legally entitled thereto."

Under this section, and section 5374.2 of the Internal Revenue Manual of 1978, plaintiffs allege that defendant should have paid the surplus proceeds to the first mortgagee of the property, *i.e.*, First Federal. However, section 5374.2(d) provides in pertinent part that the application of sale proceeds will be as follows: "If property is seized and sold to enforce *several* outstanding *tax* liens and there are *other liens* intervening between the tax liens, the proceeds of the sale must be applied toward the satisfaction of [all] the liens in order of their priority" (emphasis added). We find that this section is inapposite to the case under consideration because here there was only *one* outstanding tax lien against the property in the amount of $2,340.74. Consequently, there were no *intervening* private liens that would have had priority over a second and subsequent tax lien. Plaintiffs, therefore, err in citing to this section of the Internal Revenue Manual to support their position that the defendant had a duty to apply the surplus proceeds to the existing first mortgage.

█ Moreover, section 5374.3 of the Internal Revenue Manual of 1978 sets out the procedures whereby "any person, including the taxpayer" may make a claim for the surplus proceeds. Under this section, "the taxpayer is the person entitled to the surplus proceeds unless *another* person *establishes* a superior claim." (emphasis added). Thereunder, if no claim is made after one year, the surplus proceeds are transferred from the deposit fund account to the Trea-

sury General Fund for Revenue Receipts.[7] As a consequence of the foregoing, the IRS was not required to *sua sponte* make a payment of the surplus proceeds to the first mortgagee, but rather such payment would have been triggered by the submission of an appropriate claim to the IRS. As a result, neither the foregoing internal procedures nor the federal statute(s) support plaintiffs' position that defendant acted in violation of any laws, regulations, or internal procedures by not paying the surplus proceeds over to the first mortgagee, First Federal. Further, the record is devoid of any evidence that either First Federal or any other person ever submitted such a claim to defendant.

The third reason that plaintiffs challenged the sale claiming that it (the sale) did not proceed substantially in accordance with federal law is that the government did not establish and announce at the tax sale, and prior to the bidding, a minimum price for the property. Thus, defendant violated 26 U.S.C. § 6335(e), allege plaintiffs, in not announcing the minimum bid price *before* the sale. Section 6335(e)(1) provides in pertinent part that "[b]efore the sale the Secretary or his delegate shall determine a minimum price for which the property shall be sold.... In determining the minimum price, the Secretary or his delegate shall take into account the expense of making the levy and sale." Section 6335(e)(2) further provides that:

> The Secretary or his delegate shall by regulations prescribe the manner and other conditions of the sale of property seized by levy.... [s]uch regulations shall provide: ... [w]hether the announcement of the minimum price determined by the Secretary or his delegate may be delayed until the receipt of the highest bid.

As the foregoing clearly indicates, the statute imposes a duty on the Secretary or his agent to *calculate* a minimum price *but does not strictly impose* an affirmative duty on defendant to *announce* said price *prior* to the sale. The regulations implementing the statute at 26 C.F.R. § 301.6335–1(c)(3) (1976) confirm this conclusion and provide, in pertinent part, that "[t]he internal revenue officer conducting the sale shall *either* announce the minimum price before the sale begins *or* defer announcement of the minimum price until *after* the receipt of the highest bid, and, *if the highest bid is greater than the minimum price, no announcement of the minimum price shall be made.*" (emphasis added). First, we note that the language of this regulation grants discretion to the Revenue Officer. That is to say, he may *"either"* announce the minimum price before the sale, defer announcement until after bidding, or make no announcement if the highest bid exceeds the minimum price. Here Revenue Officer Milton, as permitted, chose the latter.

In the case now before the court, the record shows that Officer Milton, who was responsible for the sale, calculated the minimum price of $2,231.00 prior to the sale (Tr. 221–224). The court finds that, under 26 U.S.C. § 6335(e) and 26 C.F.R. 301.6335–1(c)(3), Officer Milton acted in accord with federal law in not announcing the minimum bid price before the sale since the highest bid of $15,000 was greater than the minimum bid price of $2,231. Therefore, for the reasons stated above, plaintiffs' challenges to the tax sale procedure must fail. Moreover, the court finds that the *sale* was accomplished substantially in accordance with federal law.

---

7. Section 5374.3(3) and (7) provide:

(3) The taxpayer is the person entitled to the surplus proceeds unless another person establishes a superior claim. In any case in which a claim for surplus proceeds is made by any person, including the taxpayer, a copy of an affidavit submitted by the claimant, together with a report of the pertinent facts, will be submitted to the Special Procedures Staff for referral to the Reginal Counsel for an advisory legal opinion prior to making disposition of the surplus proceeds.

\* \* \* \* \* \*

(7) If after the expiration of one year no claim has been filed, the Special Procedures Staff will prepare a memorandum to the Accounting Branch requesting the surplus be transferred from the deposit fund account to the Treasury General Fund for Revenue Receipts.

## B. The Quit Claim Deed

Plaintiffs argue, in addition to the foregoing, that the government breached its contract by not delivering a deed that was legally recordable under the laws of Puerto Rico. The first Quit Claim Deed was received by plaintiffs from defendant on or about March 18, 1977 (Pltfs' Ex. 2). Shortly after receipt of the deed, plaintiffs gave it to their attorney/notary, Ms. Mendez, to prepare it for recordation. Ms. Mendez noted that there were defects with the Quit Claim Deed that would prevent it from being recorded. First, she averred that the deed disclosed that only the taxpayer, Mr. Medina, had received notice of the tax seizure and sale while the property seized and sold was held by the conjugal partnership of Mr. and Mrs. Medina (Tr. 99). Ms. Mendez testified that the law of Puerto Rico required that notice must be given to both parties when a public sale of conjugal property is held. Another defect in the deed that would preclude recordation, as Ms. Mendez pointed out, was that the authority of the IRS official executing the deed (Mr. McGowan) was not stated on the face of the deed. (*Id.*) Ms. Mendez further testified that after reviewing the Quit Claim Deed, she contacted the local IRS official in Puerto Rico, Mr. Calderon, to inform him that the deed could not be recorded (Tr. 100). Following this contact, on May 6, 1977, Ms. Mendez's law partner wrote a letter to Mr. Calderon outlining the following defects in the deed: (1) the document did not recite that the legally-required auction notices had been published; (2) the deed did not evidence that the wife of the taxpayer received notice of the sale of the conjugal property; (3) the authority of the government officials who sold the property and executed the deed was not verified in the deed; (4) there was no evidence on the face of the deed that the other creditors with rights in the property received notice of the auction; and (5) the signature of the notary on the deed was not certified to by the appropriate county clerk. Subsequent to the letter of May 6, 1977, and several telephone conversations, Mr. Calderon assured Ms. Mendez that the deed would be returned to the central office of the IRS and the defects corrected, according to Ms. Mendez's testimony (Tr. 100).

Later, in February of 1978, Ms. Mendez contacted Mr. Calderon at the IRS to ascertain why there had been a delay in the correction of the deed. The court notes that this delay could have been due, in part, to the fact that in plaintiffs' counsel's letter to defendant on May 6, 1977, counsel referenced the property in issue as "118 Progresso Street" when the true address was 250 Progresso Street. Thus, this *mis*reference to the property may have exacerbated the problem of timely correcting the deed. Mr. Calderon subsequently informed Ms. Mendez that the IRS required an official denial of recordation from the Registry of Property to trigger the corrections. Shortly after receiving this information, Ms. Mendez prepared the Quit Claim Deed, received in March of 1977 (1977 deed), for submission to the Registry of Property (Tr. 101). This document styled "Protocolization of Deed # 2," dated February 8, 1978, was forwarded to the Registry of Property (Pltfs' Ex. 5). On or about February 14, 1978, as previously noted, defendant informed Ms. Mendez that the property purchased by plaintiffs was to be sold at auction in a mortgage foreclosure sale on March 14, 1978. This revelation caused plaintiffs to file a motion for intervention on or about February 15, 1978. On February 24, 1978, the local court stayed the then pending foreclosure proceedings, but later reinstituted them, as explained, *supra,* by reentering judgment on February 5, 1981, since the certification of the Registry of Property did not show plaintiffs to be the owners of the property of record.

The Registry of Property declined to record the 1977 deed by letter dated March 30, 1979 (Pltfs' Ex. 7). Plaintiffs had also previously received another Quit Claim Deed (1978 deed) from defendant on or about March 17, 1978 (Tr. 105, Pltfs' Ex. 4). In a second attempt to cause the Registry of Property to record plaintiffs' second Quit Claim Deed, which contained a certification of the authority of Mr. McGowan and the notary thereto, counsel prepared and submitted to the registrar Protocoliza-

tion of Deed (# 9) dated May 30, 1978. The Registry of Property also denied recordation of the 1978 deed on March 30, 1979 (Pltfs' Ex. 9). Ms. Mendez testified that the unrecorded deed in its then posture would, therefore, not be binding in Puerto Rico (Tr. 107).

As a result of plaintiffs' foregoing inability to record the deed, they argue that the government is in breach of contract since plaintiffs did not receive a legally sufficient deed under the laws of Puerto Rico. Defendant retorts by arguing that the validity of the Quit Claim Deed should be determined under federal law—and not under Puerto Rican law. To support its position, defendant maintains that it fulfilled the requirements of the applicable Puerto Rican law regarding execution of deeds, *i.e.,* section 442 of the Civil Procedure Code of 1933, 32 LPRA § 1824. This section states that "[t]he execution of an instrument is the subscribing and delivering it, with or without affixing a seal." On this point defendant cites the court to no persuasive precedent.

The threshold issue for the court to decide, against this background, regarding the deed(s) that plaintiffs received from the IRS is—what law governs the standard for determining the *legal sufficiency* of deeds issued as a result of tax sales. 26 U.S.C. § 6339(b) speaks to the legal effect of the deed issued by the IRS as follows:

(b) Deed of real property.—In the case of the sale of real property pursuant to section 6335—

(1) Deed as evidence.—The deed of sale *given pursuant to section 6338* shall be prima facie evidence of the facts therein stated; and

(2) Deed as conveyance of title.—*If* the proceedings of the Secretary or his delegate as set forth have been *substantially in accordance with the provisions of law,* such deed shall be considered and operate as a conveyance of all the right, title, and interest the party delinquent had in and to the real property thus sold at the time the

lien of the United States attached thereto.

(emphasis added).

Section 6339 refers to § 6338 in that the deed of sale "given pursuant to section 6338 shall be prima facie evidence of the facts therein stated." The facts that the deed states are the same facts set forth in the certificate of sale: identification of the real property purchased, the name of the delinquent taxpayer, the name of the purchaser, and the price paid for the property. 26 U.S.C. § 6338(a) and (b). Under § 6339(b)(1) the deed, as evidence, must be given *pursuant* to § 6338 in order to be accorded the benefit of a presumption of the truth of the facts recited by the deed. Section 6338(b) requires that the Secretary "execute (in accordance with the laws of the State in which such real property is situated pertaining to sales of real property under execution)" a deed to the purchaser at the tax sale. Here, the property in issue is located in Santurce, Puerto Rico. Further, § 6339(b)(2) requires that in order for the deed to be considered and operate as a *conveyance* of the right, title, and interest of the taxpayer in the property sold, the "proceedings of the Secretary or his delegate" must have been "substantially in accordance with the provisions of law." This reference is to the law at the situs of the property.

The court finds, therefore, that defendant had to meet both the requirements of § 6338(b) and § 6339(b)(2) in order to fulfill its obligation under the contract of sale of property to plaintiff(s). We note that a sharp focus must be placed on the distinction between the law applicable to the efficacy of a tax sale and the law applicable to the execution of a deed stemming therefrom. As to the former, we find that federal law is applicable; and as to the latter, local law governs. *Brown v. United States,* 496 F.Supp. 903, 909 (D.N.J.1980) (state law determines the nature of the property interest; federal law governs the procedural requirements of an IRS sale and seizure). Section 6338(b) imposes the obligation upon the defendant to execute the deed according to the laws, relating to the

sales of real property under "execution," of the state where the property is located. The court observes that neither party has sharply focused on the requirements of § 6338(b). As this section implicates local law, the court will, therefore, specify these requirements hereinafter. "Execution," in the context of the "sale of real property under execution," refers to the "legal process of enforcing the judgment, usually by seizing and selling property of the debtor." *Black's Law Dictionary* 510 (5th ed. 1979). The Puerto Rican statute that defines the requirements for execution of a deed to real property sold under execution is 32 LPRA 1140 which reads as follows:

### Execution of deed upon sale of immovable property

When immovable property is sold by the marshal or other duly authorized officer of any court, at public sale, *under an execution* or order of sale issued by a court of justice, it shall be the duty of such marshal or other officer to execute to the purchaser a *good and sufficient public deed* for such property, before the notary chosen by said purchaser, and the latter shall pay for such deed.

(emphasis added).

This statute clearly requires that the officer over the public sale execute a "good and sufficient public deed" to the purchaser. In this context, a public deed is a document that has been authenticated by a notary and entered into the protocols of the notary who prepared it. 31 LPRA § 3271. As attorney Mendez testified, the process of entering the deed in the protocols elevates the deed to the level of a public deed. (Tr. 107). The protocol is "the orderly collection of the original instruments authorized during a year by a notary." 4 LPRA § 1028. The "original instrument" referred to in § 1028 is "one drawn up by a notary upon the contract or writing submitted to him for authentication and which is signed by the parties ... and which is authorized by the notary ... with his signature, sign, seal and mark...." 4 LPRA § 1009. In other words, to become a public deed as required by 32 LPRA § 1140 the Quit Claim Deed that plaintiffs received

had to be first entered into the yearly collection of documents authenticated by a notary. To be a "good and sufficient" public deed the deed had to be accepted for recordation by the Registry of Property. 30 LPRA § 2 mandates that deeds conveying ownership of real property rights "shall" be recorded. Further, attorney Mendez testified that in order for the deed, *prepared outside of Puerto Rico,* to be binding, it had to be entered in the protocols and recorded. (Tr. 107). Recordation of the deed, received after a tax sale, was recognized as necessary in both the House and Senate Reports in reference to deeds to seized real property purchased at the minimum price by the United States. These Reports both stated that the recording of the deed is necessary "to keep local property titles in order." H.R.Rep. No. 1337, 83rd Cong., 2d Sess. *reprinted in* 1954 U.S.Code Cong. & Admin.News 4025, 4558 and Staff of Senate Comm. on Finance, 83rd Cong., 2d Sess., Finance Committee Report on the Internal Revenue Code of 1954, *reprinted in* 1954 U.S.Code Cong. & Admin.News 4621, 5229. The federal policy concern over keeping local property titles in order following tax sales by necessitating recordings, as required by local law, would certainly apply to deeds received by private parties as well as those received by the government.

The Registrar rejected the 1977 Quit Claim Deed, as previously indicated, for the following reasons: 1) the deed did not show that both owners of the seized conjugal property had notice of the tax sale; 2) the authority of the IRS officers to sell the property was not evident from the face of the deed; 3) the Certificate of Sale of the property was not filed with the deed to show that the requirements of law were met; 4) the fees for recording the document were not paid; and 5) the signature of the notary public before whom the IRS officer signed was not certified to by the County Clerk. The Registrar also rejected the 1978 Quit Claim Deed for substantially similar reasons: 1) it was not evident from the face of the deed that both members of the conjugal partnership owning the seized

property were notified of the public sale; 2) the authority of the IRS officers to sell the property was not evident from the recitations of the deed; 3) the Certificate of Sale was attached but did not show that the legal requirements were met; and 4) the fee for recordation was not paid. Thus, the statutorily appointed and empowered local agency found on both occasions that the Quit Claim Deeds as presented to plaintiffs and protocolized by plaintiffs' notary attorney was not "a good and sufficient public deed." (Pltfs' Exs. 7 and 9).

 As a result of the rejection of the Quit Claim Deeds by the Registry of Property, this court finds that the defendant was in breach of contract due to its failure to comply with 26 U.S.C. § 6338(b) as it implicates local law. Notwithstanding the breach, as found, the plaintiffs still have the *affirmative burden* of establishing, by credible proof, that their damages resulted *directly* from the breach under the court's jurisdictional status, 28 U.S.C. § 1491(a)(1). *H.H.O., Inc. v. United States*, 7 Cl.Ct. 703, 708 (1985) (damages considered to have been only remotely or consequentially caused by the government's breach cannot be recovered as a matter of law). Here plaintiffs at bar must, therefore, show that the government's failure to issue a *recordable deed* proximately resulted in the loss of the property and the $15,000 cash payment suffered by plaintiffs. For the following reasons, this court finds that plaintiffs failed to meet this burden. When plaintiffs attended the auction sale in 1976, Revenue Officer Milton, who was officiating at the sale, read the prescribed opening statement from the IRS Manual, according to Milton's testimony (Tr. 177). Although the precise opening statement used in 1976 was not entered into evidence by defendant, the Regulations in effect at the time of the sale, 26 C.F.R. § 301.6335–1(c)(4)(iii), direct that "only the right, title, and interest of the delinquent taxpayer in and to the property seized shall be *offered* for sale, and such interest shall be *offered subject to any prior outstanding mortgages....*" (emphasis added). The testimony of Agent Milton convincingly shows that he read the opening statement and made the Notice of

Encumbrances available to the bidder (Tr. 180, 201, 202). This critical testimony is corroborated by the testimony of Revenue Officer Pacheco, the assisting officer at the sale, who declared that Milton in fact read a substantially similar opening statement (Tr. 263, 265). Officer Pacheco also testified that plaintiff (Burgos) directly inquired of Revenue Officer Milton whether there were encumbrances against the property prior to the sale, and that Milton informed plaintiff(s) that there were encumbrances against the property (Tr. 265). Consequently, premised on this evidence, this court has found above that plaintiffs did have notice of the prior mortgages against the seized property at and prior to bidding. Additionally, plaintiffs had notice that they were buying the property *subject-to* said mortgages due to the previously mentioned mandatory announcements of the precise interest offered for sale within the opening statement.

Since plaintiffs knowingly took said property subject-to the prior mortgages they had the continuing obligation of timely curtailing these mortgages on a monthly basis. The consequence of a mortgage default is foreclosure. Since the mortgages went unpaid from December 1976, as the local court found, the first mortgagee, First Federal, filed its complaint in foreclosure (April 27, 1977) and bought in the property at the subsequent public sale. First Federal initially received a foreclosure judgment on August 26, 1977, five months after the 1977 Quit Claim Deed was sent to plaintiffs on or about March 18, 1977. The mortgagee's foreclosure and resulting sale were the proximate cause of plaintiffs' loss of the $15,000 in cash and the property. This is quite evident because, even if plaintiffs had had a Quit Claim Deed which was duly recorded on March 18, 1977, they would nevertheless have been faced with the *same* mortgage foreclosure proceedings and still would have had to pay the mortgagee off to protect their interest in the property. Burgos elected not to make periodic payments on the mortgages, although the property was purchased subject-to, thus, the resulting foreclosure and the loss

stemmed from his intentional omissions. In other words, the loss of the property, etc., flowed directly from the nonpayment of the mortgage rather than from the receipt of the nonrecordable deed. Given the foregoing, plaintiffs fail to meet their burden of showing that their loss was *directly attributable* to the government's breach. There is no assurance that plaintiffs would have paid the delinquent mortgage payments even if the deed had been timely recorded with the Registry of Property. On the contrary, Ms. Mendez testified that plaintiff (Burgos) stated to her that he "would not pay for the property twice" in reference to the option of paying off the mortgage to avoid the foreclosure (Tr. 101–102). It is clear beyond cavil, therefore, that the damages suffered by plaintiffs were not even remotely caused by the government's breach, thus relief cannot be granted as a matter of law. *H.H.O., Inc.*, 7 Cl.Ct. at 708. In other words, plaintiffs failed to demonstrate the necessary nexus or linkage between the unrecordable deed and their loss.

The fact that the Registry of Property refused to record the 1977 and 1978 Quit Claim Deeds, due to defendant's omissions, resulted in a breach of contract, but this court finds that defendant's "omissions" were harmless error with regard to plaintiffs' damages. *See Laka Tool & Stamping Co., Inc. v. United States*, 7 Cl.Ct. 213 (1984) (contract appeal board's mistake in including certain language into a government contract was harmless error). Here the court notes that the Registrar refused recordation for several reasons—not all the fault of defendant. Since the authority of the government agents to sell the seized property was not apparent on the face of the 1977 Quit Claim Deed, the Registrar rejected it. On the face of the 1978 Quit Claim Deed, defendant added the following: 1) an authentication of the deed by the Secretary of State; 2) an assurance of the authority of the Director of International Operations, executor of the deed, by the Assistant Director of Disclosure Operations Division; 3) a reference to the Code section, 26 U.S.C. § 6338, that empowered the Revenue Officer to sell the taxpayer's property; and 4) a certification of the signing notary's authority by the Executive Secretary to the Commissioner of the District of Columbia. These additions addressed the defects attributable to defendant.[8]

However, we find that plaintiffs were responsible for one of the cited defects, and the record reflects no evidence that they sought to cure such defect. According to local law plaintiffs were responsible for the fees of recordation. 32 LPRA § 1140. This section states that it shall be the duty of the *purchaser* of the property to pay for the deed. Plaintiffs failed to pay the necessary fees and consequently plaintiffs' omission, which was never corrected, also caused the deed to be unrecordable.[9] Therefore, defendant's corrected omissions were harmless errors in that they alone did not preclude recordation.

The other damages claimed by plaintiff (Burgos) relating to his health sound in tort and are outside the jurisdiction of this court.[10]

---

8. The issue of notice to the taxpayer's wife as a defect precluding registration is questionable since the only property sold at the tax sale was *the interest of the taxpayer*, leaving the wife's interest in the seized property untouched. *City of New York v. United States*, 283 F.2d 829, 832 (2d Cir.1960) (federal tax lien only attaches to the extent of the taxpayer's property interest). Under Puerto Rican law, the conjugal partnership is governed by partnership law. 31 LPRA § 3624. Partnership law allows the creditors of each partner "to demand the attachment and sale at auction" of that partner's share in the "partnership capital." 31 LPRA § 4373. Thus the interest of the taxpayer could be seized and sold without affecting the interest of the taxpayer's wife. Thus the wife would not require notice.

9. The Registrar's rejection letter of May 30, 1979 also stated that the Certificate of Sale did not "comply with law requirements," but this court has found that the contents of the recitations of the Certificate of Sale complied with federal law which is the controlling law on procedures in federal tax sales. *Brown v. United States*, 496 F.Supp. 903 (D.N.J.1980).

10. The court has considered all other contentions not specifically addressed herein and found them to be without merit.

## Conclusion

For the foregoing reasons, this court finds for defendant and, therefore, directs the clerk to enter judgment accordingly. No costs.