**Carl SHELDEN and Mary Shelden, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

No. 164–88L.

United States Claims Court.

Jan. 12, 1990.

Landon Dowdey, Washington, D.C., for plaintiffs. Brenda Grantland, Washington, D.C., of counsel.

Celia I. Campbell–Mohn, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This case comes before the court on plaintiffs' motion for summary judgment as to liability, and defendant's cross-motion for summary judgment, or in the alternative, to dismiss. Plaintiffs were innocent mortgagees of real property under a deed of trust. This property was ordered forfeited when the mortgagor was convicted of violating federal anti-racketeering statutes. Although the order of forfeiture was eventually vacated, plaintiffs were prevented from foreclosing their lien for over two years, during which time the property sustained severe, preventable, and apparently permanent damage. Plaintiffs allege that the government's actions amounted to a taking of their property without just compensation, in violation of the fifth amendment to the United States Constitution. For the reasons set forth below, plaintiffs' motion for summary judgment as to liability is granted.

## FACTS

The parties' proposed findings of uncontroverted fact accompanying their motions and the representations of counsel at oral argument reveal agreement on virtually all of the relevant facts.[1] The only dispute is whether, under the facts, plaintiffs have a remedy at law.

Plaintiffs Carl and Mary Shelden owned real property at 1065 Wickham Drive, Moraga, California (the Moraga property), as joint tenants. On May 23, 1979, they sold the property to Ralph and Freddie Jean Washington for $289,000, taking back a promissory note in the amount of $160,-

---

1. The parties disagree on the measure of plaintiffs' damages, but such a dispute is not relevant to the question at hand: whether the United States is liable to the Sheldens.

435.65, secured by a deed of trust.[2] Under the terms of the note, the Washingtons were to make monthly payments of $1602.41 until June 1, 1986, at which time the balance on the note was to become due. The note also gave the signatories the option to renegotiate at the end of the initial seven-year period, continuing the note for an additional five years.

On February 15, 1983, the Washingtons were indicted for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. The indictment alleged that the Moraga property was subject to forfeiture under RICO. On March 7, 1983, the Washingtons conveyed the Moraga property to the Clerk of the United States District Court for the Northern District of California by deed of trust with power of sale, to secure payment of their bail bonds.

On October 7, 1983, the Sheldens' trustee filed a notice of default and election to sell the Moraga property. At that time, payments on the note held by the Sheldens were $6264.88 in arrears. The United States attorney was notified that the Moraga property was to be sold at a foreclosure sale to be held in January, 1984, when the three-month redemption period required by California law would have expired.

Ralph Washington was found guilty on 12 counts of the indictment on December 1, 1983. The jury which rendered the verdict declared the Moraga property forfeited under 18 U.S.C. § 1963. On December 9, 1983, the United States filed a notice of *lis pendens* on the Moraga property, reciting the jury verdict and declaration of forfeiture.

On January 31, 1984, the United States District Court for the Northern District of California entered an "Order Re Forfeiture of Properties and Disposition Thereof Pending Appeal." The order effectively suspended the Sheldens' foreclosure rights. Although the order was signed by the district judge and entered by the clerk of the district court, it was for all intents and purposes a stipulation between the United States Attorney and Mr. Washington. Because the order of forfeiture is central to the dispute, it is necessary to set out pertinent portions at length here:

[P]laintiff United States of America and defendant Ralph Huey Washington having stipulated to the entry of the following order with respect to the property declared forfeitable, it is hereby ordered as follows:

1. This order applies to the following parcels of real property:

\*   \*   \*   \*   \*   \*

(j) 1065 Wickham Drive, Moraga, CA.[3]

\*   \*   \*   \*   \*   \*

3. Any and all interest of the defendant Ralph Huey Washington in and to the aforesaid real properties is hereby deemed transferred to plaintiff United States of America effective January 20, 1984, although for the convenience of the parties and to put into effect the terms of this order record title shall remain (where applicable) in the name of Ralph Huey Washington....

\*   \*   \*   \*   \*   \*

5. (A) Defendant Ralph Huey Washington, or his designated representative, shall be entitled to remain in physical possession of, and to have management and control of[:]

\*   \*   \*   \*   \*   \*

(b) 1065 Wickham Drive, Moraga, CA;[4]

\*   \*   \*   \*   \*   \*

(B) Defendant, so long as he is not in custody, shall be entitled to reside in the property known as 1065 Wickham Drive, Moraga, CA;....

\*   \*   \*   \*   \*   \*

(D) Defendant Ralph Huey Washington, or Freddie Washington, or such oth-

---

**2.** The Sheldens held a second deed of trust; the first deed of trust was held by a California lending institution.

**3.** The order listed nine other pieces of real property owned or controlled by Mr. Washington prior to his conviction.

**4.** The order listed three other properties.

er person as Ralph Washington may designate ... shall manage the foregoing properties, and all rents obtained therefrom shall be deposited into an account maintained jointly by plaintiff United States of America and defendant Ralph Huey Washington, and the proceeds thereof shall be used for the purpose of maintaining mortgage payments, utilities, repairs, and other such expenses which are ordinarily and customarily those of a landlord of real property.

\*     \*     \*     \*     \*     \*

10. ... [P]laintiff [the United States] shall not be prohibited from recording in the appropriate state or county offices notices of liens as permitted by law.

11. Upon final disposition of [Ralph Huey Washington's] appeal [from his criminal conviction], the property declared forfeitable shall forthwith be irrevocably vested in plaintiff United States of America, or released to defendant Ralph Huey Washington, as the result of said appeal shall indicate.

12. This court retains continuing jurisdiction over the subject real property to make such further supplementary orders as may be necessary or appropriate to effectuate the intent and purpose of this order and to determine, to the extent permitted by law, the claims, if any, of third parties in and to the aforesaid property.

DATED: 31 JAN 1984

/s/ [Judge] Robert H. Schnacke

SO STIPULATED:

Joseph P. Russoniello

United States Attorney

By: /s/ Robert L. Dondero

Assistant United States Attorney

/s/ Ralph Huey Washington

While the Moraga property was under the control of the government and Mr. Washington, the hill upon which the house was built eroded severely. As a consequence, the market value of the property declined significantly.[5]

On August 20, 1986, the United States Court of Appeals for the Ninth Circuit reversed the conviction of Ralph Washington. *United States v. Washington,* 797 F.2d 1461 (9th Cir.1986). The effect of this ruling was to vacate the forfeiture verdict. The trustee under the May 23, 1979 deed of trust held a foreclosure sale on February 23, 1987, at which sale the Sheldens bought the Moraga property for $115,500.

## DISCUSSION

■ Summary judgment is appropriate where the pleadings, motion papers, affidavits, and other documents properly before the court, reveal no genuine dispute of material fact, and as a matter of law, one party is entitled to judgment. RUSCC 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (construing Fed.R.Civ.P. 56). Here, the material facts are not in dispute, and they establish a taking. Thus, plaintiffs are entitled to summary judgment on the issue of liability.

### I. Property interest cognizable under the fifth amendment.

■ The fifth amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." As a threshold matter, the court must address defendant's assertion that the Sheldens' interest in the Moraga property is not "property" within the meaning of the just compensation clause. If defendant is correct, then no further analysis is necessary, and the case must be dismissed.

In *Murray v. United States,* 817 F.2d 1580, 1583 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 1318, 103 L.Ed.2d 587 (1989), the court held that "[a] mortgagee's lien is a property interest within the meaning of the Fifth Amendment." (Citations omitted). *Murray* notwithstanding, defendant contends that the right to foreclose is not a property right cognizable under the fifth amendment's just compensation

---

5. The government estimated the value of the Moraga property for bail purposes at $325,000. The Sheldens allege that as a result of the erosion, the value of the property dropped to approximately $60,000. The erosion could have been avoided with the expenditure of approximately $10,000 in preventive maintenance.

clause, citing *Oglethorpe Co. v. United States*, 558 F.2d 590, 214 Ct.Cl. 551 (1977), and *Sol–G Construction Corp. v. United States*, 231 Ct.Cl. 846 (1982), as support. Neither case is apposite. In both *Oglethorpe* and *Sol–G Construction*, the United States, through the Department of Housing and Urban Development, foreclosed on properties it held as mortgagee. The Court of Claims held in both cases that parties with inferior security interests in the properties, whose liens were extinguished by the foreclosure sales, could not recover on taking claims.

The grounds for distinguishing *Oglethorpe* and *Sol–G Construction* from the present case are numerous, but the key distinction lies in the character of the government action in those cases, as opposed to that in the case at bar. In *Oglethorpe* and *Sol–G Construction*, the United States was acting in its proprietary capacity; it acted just as a private party with a superior security interest would have acted. By contrast, in the instant case, the government acted in its sovereign capacity. The distinction was explained by the Court of Claims in *DSI Corp. v. United States*, 655 F.2d 1072, 228 Ct.Cl. 299, 302–303 (1981):

> When the government "takes" property, it exercises its right as sovereign to acquire property from the rightful owner for the public good.... Such an exercise is distinct from the right of ultimate ownership.... In the instant case, however, the government did not exercise its sovereignty and expropriate private property from the rightful owner. Instead, the government asserted a claim of right to the property, *i.e.*, that it was entitled to be the rightful owner of the property as the only holder of a valid mortgage on the property and that DSI had no rights

in the chattel because its mortgage was void. In essence, this case involved a contest between two parties over conflicting claims of ownership.

(Citations omitted.)

Here, the government never asserted a right of ownership as holder of a mortgage on the Moraga property. Rather, it exercised the power of the sovereign to impose penal sanctions, and declared the property forfeited under RICO. Thus, *Oglethorpe* and *Sol–G Construction* do not apply, and the Sheldens can maintain a taking claim.

II. The elements of a taking.

In determining whether a taking has occurred, the court must examine the character of the government action, as well as the impact of the government action on the rights of the property owner involved. *See generally Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), *reh. denied*, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978). However, it is

> not necessary for the [government] to have actually taken physical possession of plaintiff's property in order for there to have been a fifth amendment taking. A taking can occur simply when the Government by its action deprives the owner of all or most of his interest in his property.... Thus, it is the loss to the owner of the property and not the accretion to the Government which is controlling in fifth amendment cases.

*Aris Gloves, Inc. v. United States*, 420 F.2d 1386, 190 Ct.Cl. 367, 374 (1970) (citations omitted).

■ Although the Supreme Court has endorsed a case by case approach to taking claims, *e.g., Agins v. Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), six elements recur in the case law.[6] First,

---

6. It has been argued that intent is one of the elements of a taking. Thus, it is argued that in order to effect a taking, the government must intend to effect a taking. *See, e.g., Foster v. United States*, 607 F.2d 943, 221 Ct.Cl. 412, 424 (1979); *Sun Oil Co., Inc. v. United States*, 572 F.2d 786, 215 Ct.Cl. 716, 770 (1978); *Columbia Basin Orchard v. United States*, 132 F.Supp. 707, 132 Ct.Cl. 445 (1955). Though a showing of government intent to take has been used in

certain instances to show that the government's acts were direct and not consequential, *see, e.g., Berenholz v. United States*, 1 Cl.Ct. at 627, other cases hold that negligent or inadvertent destructive actions by the government can result in a taking. For example, the Supreme Court has held that the unintentional flooding of private land due to the government's adjusting the flow of waterways constitutes a taking. *See United*

the government must have invaded or interfered with plaintiff's property. *Berenholz v. United States,* 1 Cl.Ct. 620, 626 (1982), *aff'd.,* 723 F.2d 68 (Fed.Cir.1983); *Florida East Coast Prop., Inc. v. Metropolitan Dade County,* 572 F.2d 1108, 1111 (5th Cir.1978), *cert. denied,* 439 U.S. 894, 99 S.Ct. 253, 58 L.Ed.2d 240 (1978). Second, the government's invasion must have deprived plaintiff of a substantial right or interest in plaintiff's property. *Berenholz,* 1 Cl.Ct. at 626; *Florida East Coast Prop., Inc.,* 572 F.2d at 1111. Third, the government's invasion must have been a direct act. *Hartwig v. United States,* 485 F.2d 615, 202 Ct.Cl. 801 (1973); *Berenholz,* 1 Cl.Ct. at 630; *Florida East Coast Prop., Inc.,* 572 F.2d at 1111. Fourth, the government's invasion of plaintiff's property must be permanent or inevitably recurring. *Hartwig,* 202 Ct.Cl. at 809; *Bettini v. United States,* 4 Cl.Ct. 755, 758 (1984); *Berenholz,* 1 Cl.Ct. at 626. Fifth, the government's invasion of plaintiff's property must be authorized by Congress. *Portsmouth Harbor Land & Hotel Co. v. United States,* 260 U.S. 327, 330, 43 S.Ct. 135, 67 L.Ed. 287 (1922); *Sun Oil Co. v. United States,* 572 F.2d 786, 215 Ct.Cl. 716 (1978); *Bettini,* 4 Cl.Ct. at 758. Sixth, the government must have usurped plaintiff's property to benefit the public. *Baird v. United States,* 5 Cl.Ct. 324, 330 (1984); *Berenholz,* 1 Cl.Ct. at 631. Here, all of these elements have been met.

The government interfered with the Sheldens' interest in the Moraga property, when it filed a notice of *lis pendens* on the property on December 9, 1983. The notice announced to the world that the United States had a lien on the property, and it effectively destroyed the value of the Sheldens' security interest. *See First English Evangelical Lutheran Church v. Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (temporary takings which deny landowners use of property are no different in kind from permanent takings). The interference continued while the Sheldens were prevented from foreclosing on the property pending Mr. Washington's appeal. The government argues that it never had title to, possession of, or control over, the Moraga property. Such a contention runs counter to the uncontroverted facts recounted above, and cannot be taken seriously.[7] Defendant's argument asks the court to believe that while the United States asserted a lien on real property, and prevented innocent mortgagees from foreclosing on the property, it did not in any way control that property. The government's position is, as the late Chief Judge Marvin Jones once said, "[s]ingularly free from any suspicion of logic." *Belcher v. United States,* 94 Ct.Cl. 137, 140 (1941).

The government's interference deprived the Sheldens of a substantial interest in the property. The loss in value to the Moraga property while plaintiffs' foreclosure rights were suspended was significant. On December 9, 1983, when the government filed the notice of *lis pendens,* the Moraga prop-

*States v. Cress,* 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917).

It has also held that the firing of artillery shells over private property might constitute a taking. *See Portsmouth Harbor Land & Hotel Co. v. United States,* 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922). Likewise, the Supreme Court found that the invasion of an individual's air space by government planes constitutes a taking. *See United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). It is implicit from these holdings that government intent to take property is not a necessary element of an inverse condemnation claim. It is enough that plaintiff's property has been invaded by the government's direct act and its value has been substantially impaired. Additionally, the Court of Claims has held that intent is not a necessary element of an inverse condemnation claim. *See Eyherabide v. United States,* 345 F.2d 565, 170 Ct.Cl. 598 (1965); *Richard v. United States,* 282 F.2d 901, 152 Ct.Cl. 225 (1960), *modified on other grounds,* 285 F.2d 129, 152 Ct.Cl. 266 (1961). Thus, the court need not address the question whether the officials involved in the forfeiture of the Moraga property intended to effect a taking.

7. Defendant's argument is also internally inconsistent. It cites *DSI Corp. v. United States,* 655 F.2d 1072, 228 Ct.Cl. 299, 303 (1981), for the proposition that "there is no taking where, pursuant to a court order, the government is in possession of property to which it asserts a claim of rightful ownership." Thus, the government appears to be arguing here that it *did possess* the Wickham Drive property.

erty had a market value of $325,000, according to the government's own estimate. Thus, had the Sheldens been allowed to foreclose in January 1984, the proceeds from the sale would have satisfied the balance due on the promissory note. The Sheldens allege that the property was worth only $61,000 when they were finally allowed to foreclose in February, 1987. Thus, the loss of the Sheldens' right to foreclose can be valued at approximately $99,000.[8]

The government's interference was direct. The notice of *lis pendens* was filed against the Moraga property;[9] the order of forfeiture specified the same property. The actions of the officials involved in the forfeiture proceeding were authorized; defendant has conceded as much. The government's actions caused permanent injury to the Sheldens; the decline in the value of the Moraga property is permanent. Finally, the order of forfeiture and filing of the *lis pendens* were actions taken to benefit the public. As explained more fully in section III below, *in personam* forfeitures serve the public's interests in enforcing penal sanctions.

### III. Collateral attack on the district court's order.

The government argues, relying primarily on *Meincke v. United States,* 14 Cl.Ct. 383 (1988), that the Sheldens' claim amounts to an impermissible collateral attack on the district court's order. In *Meincke,* plaintiff sued for $23,000, alleging an improper taking of private property for public use without just compensation. The subject of the claim, two vehicles in which Ms. Meincke alleged an interest, had been ordered forfeited by the United States District Court for the Eastern District of Michigan, after Ms. Meincke's husband was convicted of violating federal narcotics laws and operating a continuing criminal enterprise. Judge Futey ruled that the Claims Court could not consider plaintiff's challenge to the district court's order of forfeiture, explaining that Meincke's complaint was, "in essence, ... a collateral attack on the district court's forfeiture ruling." 14 Cl.Ct. at 386. Judge Futey went on to say that "[t]he Claims Court's jurisdiction does not extend to the review of substantive actions taken by other federal courts." *Id.*

The court does not quarrel with the proposition that the Claims Court lacks jurisdiction to review district court orders. However, such a statement of the law does not control the outcome of this case. At the time Ms. Meincke's taking claim was brought, the order of forfeiture issued by the district court was in full force and effect. Had Judge Futey granted Ms. Meincke the relief she sought, he would have been, in effect, nullifying the district court's order. However, the court's task in a taking claim is to determine whether otherwise valid government action which adversely affects property owners, entitles the property owners to just compensation. *See Florida Rock Industries v. United States,* 791 F.2d 893, 900 (Fed.Cir.1986) (taking can result from valid regulation). The court today does not purport to examine the validity of the district court's forfeiture order, nor would granting the Sheldens the relief they seek effectively nullify a court order. The court is simply fulfilling its mandate under the Tucker Act to award money damages to plaintiffs who can establish a violation of the Constitution.

---

8. The court employs these figures for illustrative purposes only, to demonstrate that the Sheldens' loss is significant and measurable. The case is before the court on plaintiff's motion for summary judgment on liability; the amount of damages due will be left for a later stage in the proceedings.

9. In *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), the Supreme Court ruled that the mere filing of a *lis pendens* by the United States did not result in the taking of petitioner's property, where the filing did not prevent the petitioner from using the property as it wished, or from selling the land. In the present case, however, the government did prevent the Sheldens from using the property in the only way they could namely, selling it at a foreclosure sale. It prevented the sale from occurring for a period of over three years, during which time the property lost much of its value through waste.

The *Meincke* case is distinguishable on an additional ground. *Meincke* involved an *in rem* forfeiture under 21 U.S.C. § 848(a)(2), whereas the present case involves an *in personam* forfeiture. In an *in rem* forfeiture case, the property which prosecutors seize and subject to forfeiture is property which itself has been the situs of, or facilitated the commission of, criminal activities. In an *in personam* forfeiture, by contrast, prosecutors seek forfeiture as a penalty against the defendant, where the property itself was not involved in illicit activity. The government's interest in *in rem* forfeiture actions is "preventing continued illicit use of the property and in enforcing criminal sanctions." *United States v. One 1979 Cadillac Coupe de Ville*, 833 F.2d 994, 1000 (Fed.Cir.1987) (*quoting Colero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679, 94 S.Ct. 2080, 2089, 40 L.Ed.2d 452 (1974)). In the instant case, the Moraga property was ordered forfeitable as a criminal penalty levied against Mr. Washington, and there is no allegation, nor has there ever been an allegation, that the property itself was the site of criminal activity.[10] Thus, the government's interest in preventing the continued illicit use of the property is absent here.

Defendant argues that it is the rule of the Federal Circuit that there can be no recovery, under a taking theory, for loss in value while the United States holds property pending the outcome of a forfeiture proceeding, citing *United States v. One 1979 Cadillac Coupe de Ville*, 833 F.2d 994 (Fed.Cir.1987). In *One 1979 Cadillac Coupe de Ville*, the court ruled that the owner of an automobile allegedly used to facilitate illegal drug sales could not recover for the loss of use of his vehicle while it was held by police pending the outcome of *in rem* forfeiture proceedings, where the government ultimately abandoned the forfeiture proceedings and returned the vehicle to the owner. As discussed above, the instant case involves *in personam*, not *in rem*, forfeiture. The Moraga property

was ordered forfeitable as a criminal penalty levied against Mr. Washington, and as noted earlier, the concerns involved in *in rem* forfeitures do not come into play in this case.

Judge Futey's decision in *Meincke* was mindful of the important public interest in preventing illicit activity through *in rem* forfeiture. Prosecutors and judges involved in *in rem* forfeiture proceedings must be free to fulfill this public interest without having forfeiture orders subjected to second-guessing via a taking claim. However, the exigencies of preventing criminal activity are not present in an *in personam* forfeiture proceeding, where the property at issue is not even alleged to be involved in illicit activity. From a policy standpoint, the court sees little danger in entertaining a suit such as the present one.

### IV. Diminution in value.

■ Defendant argues that mere diminution in the value of property is not compensable in an inverse condemnation claim. It is true that "the decisions of the Supreme Court 'uniformly reject the proposition that diminution in property value, standing alone, can establish a taking.' " *Jentgen v. United States*, 657 F.2d 1210, 228 Ct.Cl. 527, 532 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982) (*quoting Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978), *reh. denied*, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978)). However, in this case, the Sheldens' allegations of diminution in the value of their property do not stand alone; the government suspended the Sheldens' foreclosure rights.

Furthermore, the cases rejecting takings claims based on the mere-diminution-in-value doctrine are virtually all challenges to land-use regulations, and are not apposite to the instant case. "In deciding whether a particular governmental action has effected a taking, [the court should focus on] both the character of the action and on the

---

**10.** This is strongly buttressed by the fact that the officials involved agreed to allow Mr. Washington to continue to reside at the Wickham Drive property after his conviction. The irony in this case is that only the innocent third parties lost property as a result of the forfeiture; the alleged criminal retained possession of the forfeited property!

nature and extent of the interference with [property] rights." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). If government regulation goes too far, it will be recognized as a taking. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The mere-diminution-in-value doctrine arose because courts recognized that "government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Id.* at 413, 43 S.Ct. at 159.

The case at bar is not a regulatory taking case, and the concerns underlying the mere-diminution-in-value doctrine do not come into play. The character of the governmental action in this case was not a legislative act, general in nature, affecting property owners at large. Rather, the action was penal, directed specifically at the personal interest at issue here. There is no danger that government will be forced to compensate property owners for "every change in the general law;" the court today only requires that when prosecutors seek forfeiture under RICO, they be careful not to disturb the property rights of innocent lienholders. When such rights are disturbed, the government must be prepared to provide just compensation.

### V. Plaintiffs' failure to exercise other remedies.

■ Defendant argues that plaintiffs had three remedies available to them under RICO, none of which they pursued: (1) the district court judge could have made equitable changes in the forfeiture order to protect third-party interests, under 18 U.S.C. § 1963(f), (2) plaintiffs could have petitioned the court for relief under 18 U.S.C. § 1963(*l*)(2); and (3) plaintiffs could have petitioned the Attorney General for remission of the forfeiture under 18 U.S.C. § 1963(g)(1).

The first two options outlined above are available only to persons who assert "a legal interest in property which has been ordered forfeited to the United States." 18 U.S.C. § 1963(*l*)(2). The Sheldens, as mortgagees, held an equitable interest, but no legal interest, in the Moraga property. Thus, the first two options were not available to them. Furthermore, sections 1963(f) and 1963(*l*) were added by the 1984 amendments to RICO, and did not become effective until October 12, 1984. Thus, even if options (1) and (2) were available to the Sheldens, the Sheldens could not have been expected to have pursued them, as the forfeiture of the Moraga property occurred in late 1983.

■ The Sheldens' failure to pursue the third option—petitioning the Attorney General for remission of the forfeiture—does not preclude them from bringing their taking claim in this court. The government never sent the Sheldens the statutorily required notice to interested persons, informing them formally of the forfeiture and their right to petition for remission.[11] Without the required notice, there was nothing to trigger the Sheldens' filing of a petition, nor was there anything to trigger the running of the sixty-day statute of limitations for filing a petition for remission. Although the Sheldens had constructive notice of the forfeiture, the court sees no reason why the government should be excused from following its own rules, which afford procedural protections for innocent persons with interests in forfeited property. Even if the government were now to comply with its own rules regarding the giving of legal notice to persons adversely affected by a forfeiture order, the order of

---

11. Prior to the October 12, 1984 amendments to RICO, 18 U.S.C. § 1963(c) incorporated by reference the United States Customs Service regulations governing petitions for remission and mitigation of forfeitures. 19 C.F.R. § 171.12(b) (1983), provided that "[p]etitions for relief shall be filed within 60 days from the date of mailing of the notice of fine, penalty, or forfeiture incurred...."

19 C.F.R. § 162.31(a) (1983), provided that

[w]ritten notice of any fine or penalty incurred as well as any liability to [sic] forfeiture shall be given to each party that the facts of record indicate has an interest in the ... seized property. The notice shall also inform each interested party of his right to apply for relief under ... any ... applicable statute authorizing mitigation of penalties or remission of forfeitures....

forfeiture has been vacated, and thus, the petition procedure is unavailable. The Sheldens' only remedy is the present taking claim.

Furthermore, the government's argument depends upon satisfying the court that the remission procedures are the exclusive remedy for persons asserting an interest in forfeited property. The fact that the Sheldens failed to petition the Attorney General for remission of the forfeiture, standing alone, does not explain why the Sheldens cannot pursue their taking claim. Relying on *United States v. L'Hoste*, 609 F.2d 796 (5th Cir.1980), *cert. denied*, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980), defendant maintains that petitioning the Attorney General for the remission of a forfeiture is indeed the exclusive remedy for innocent property owners claiming an interest in forfeited property. Defendant has seized on the Fifth Circuit's interpretation of 18 U.S.C. § 1963(c), which provides that "[t]he United States shall dispose of all [forfeited] property as soon as commercially feasible, making due provisions for the rights of innocent persons." From these words, the Fifth Circuit concluded that "[i]t would appear that Mrs. L'Hoste's remedy lies in petitioning the United States, through the Attorney General," in order to recover her property. 609 F.2d at 812. The legislative history to the 1984 amendments to RICO also state that "the remission ... process ... remain[s] the appropriate exclusive remedy for third parties" who claim an interest in forfeited property. *See 1984 U.S.Code Cong. & Admin.News*, p. 3391. Were the court to reach the question, it would be reluctant to conclude, based on the *L'Hoste* case and a few words from the Senate report on the 1984 RICO amendments, that the Sheldens' only route to relief is to petition the Attorney General. *See Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1556 (Fed. Cir.1985) (exchange provisions of the Surface Mining Control and Reclamation Act provided a remedy, but not the exclusive remedy, for owners of mining property adversely affected by the Act; statutory supersession of the Tucker Act method of obtaining just compensation for property

taken is not lightly to be implied). However, the court need not rule on the question whether the remission procedures are the exclusive remedy. As stated above, the government cannot expect to be excused from providing the Sheldens with proper legal notice of the forfeiture, and at the same time argue that the Sheldens are confined to the remission procedure as their sole remedy.

## VI. Governmental immunity from suit in tort.

■ Defendant argues that plaintiffs' claim sounds in tort, and is therefore beyond the jurisdiction of this court. Defendant further urges that transfer of this case to a district court under 28 U.S.C. § 1631 would be improper, because Congress has not waived the defense of sovereign immunity in suits such as the instant one. This argument also fails.

The Claims Court's jurisdiction does not extend to claims against the United States sounding in tort. 28 U.S.C. § 1491(a)(1). Therefore, to the extent that plaintiffs allege negligent maintenance or waste of the Moraga property, the court is without jurisdiction. However, the Sheldens are before this court alleging a taking of their property for public use without just compensation. Both a taking claim and a tort claim can arise from the same set of events. *See, e.g., National Union Fire Insurance Co. v. United States*, 19 Cl.Ct. 188 (1989).

Defendant cites 28 U.S.C. § 2680(c) as being an exception to the government's waiver of sovereign immunity. That section states that the "provisions of the [Federal Tort Claims Act] shall not apply to ... the detention of goods" by law enforcement officers. The instant case involves real property, not goods. Moreover, section 2680(c) is an exception to the Federal Tort Claims Act (FTCA); the Sheldens are suing under the Tucker Act and the fifth amendment, and not under the FTCA. *See also Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980) (provision of FTCA exempting liability for damages to goods detained by customs officials did not preclude owner of goods from suing based on an

implied contract for bailment). 28 U.S.C. § 2680(h) excepts suits for "interference with contract rights" by law enforcement officers from the Federal Tort Claims Act, but again, plaintiffs are not suing under the FTCA, so this exception is also inapplicable.

## CONCLUSION

Clearly the district court had the power to enter the order of forfeiture at issue in this case, and to have it enforced. However, under the Tucker Act, this court is given jurisdiction over claims against the United States based upon alleged violations of the Constitution. The court today does not purport to exercise a newly-found power to invalidate district court orders. Rather, it is simply carrying out its longstanding mandate to see that owners of private property which has been taken for public use receive just compensation. While the court recognizes the strong public interest in enforcing penal sanctions, there is no reason why innocent mortgagees should be forced to bear the expense of the government's attempts to enforce these sanctions. Accepting the government's position—that a taking claim can never arise when the government acts pursuant to a court order—would render the just compensation clause a dead letter. Innocent persons with interests in property affected by court orders would be without remedy. *See Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

The government's motion to dismiss, or in the alternative, for summary judgment, is DENIED; plaintiffs' motion for summary judgment on liability is GRANTED.