**Barjona J. MEEK and Roberta L. Meek, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 392–88T.

United States Claims Court.

Oct. 2, 1992.

Marshall W. Taylor, with whom was Karen J. Simonson, Claremont, Cal., for plaintiffs.

Elizabeth D. Depriest, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This tax case involves the sale of real property seized by the Internal Revenue Service (IRS) from a delinquent taxpayer. Plaintiffs, Barjona J. Meek and his wife Roberta L. Meek, seek a refund of the purchase price they paid in a sealed bid tax sale for the taxpayer's interest in property located at 74-725 Joni Drive in Palm Desert, California, as well as interest and attorney fees. The Joni Drive property was encumbered by a secured loan owed to C & M Building Materials, Inc. (C & M), a lien holder superior to the IRS. Following the tax sale but before plaintiffs received a deed, C & M Defined Benefit Pension Trust (which had acquired the trust deed on the C & M note) foreclosed on the property. The IRS then redeemed the property from C & M Defined Benefit Pension Trust and resold the property in a second sealed bid tax sale to a party not involved in this suit. The IRS did not refund the money paid by plaintiffs in the first tax sale.

Upon a full consideration of the entire trial record, and the argument and findings submitted in the post-trial briefs, the court concludes that defendant must prevail. The reasons for this decision are set forth below.

## FACTS

This action arises from the 1986 tax seizure and sale of James L. Sharp's interest in a parcel of improved commercial property located at 74-725 Joni Drive in Palm Desert, California, to plaintiffs. The property was owned by Mr. Sharp and his wife, Dixie D. Sharp, as joint tenants. On May 30, 1984, pursuant to 26 U.S.C. § 6331 [1], the IRS levied upon the Joni Drive property to satisfy, in part, Mr. Sharp's outstanding employment tax liabilities of almost $700,000.00. Notices of the federal tax liens placed on the property were duly filed in August 1982, October 1983, and May 1984.

On April 16, 1986, the Revenue Officer in charge of Mr. Sharp's account, Antonio Corpus, prepared a Notice of Sealed Bid Sale (IRS Form 2434-A) announcing that Mr. Sharp's "right, title, and interest" in the property would be sold at a public sale under sealed bid on April 30, 1986. This Notice stated that the property would be sold "where is" and "as is" and without

---

1. Unless noted otherwise, all Internal Revenue Code (IRC) section references are to the Internal Revenue Code of 1954, which was in effect for the relevant years.

recourse against the United States. The Notice also contained disclaimers as to warranty and validity of title. It further stated that the property was offered for sale subject to encumbrances superior to the federal tax liens, and warned that no claim for rescission would be considered based on the failure of the property to meet any representation, expressed or implied, in the Notice. The Notice stated that the IRS would furnish information about possible encumbrances on the property upon request.

Mr. Corpus also prepared a Seizure and Sale Worksheet (IRS Form 4585). This form listed Mr. Sharp's tax liability as $807,707.24, and stated that no bid for the Joni Drive property under $58,000 would be accepted. Mr. Corpus testified at trial that he calculated the minimum bid price using a fair market value for the property of $400,000. This amount had been determined at the time of the levy by Mr. Sal Mungo, the Revenue Officer in charge of the case when the property was seized in 1984. Mr. Corpus testified that it was his opinion that the fair market value of the property at the time of the sealed bid sale, two years after the seizure, was still $400,-000. However, Mr. Corpus further testified that he believed the value of the property had increased somewhat since then because it was located in a fast-growing industrial area. The worksheet listed a superior first deed of trust, with a balance due of $190)000, in favor of C & M.[2] The resulting $210,000 equity was further reduced by 15 percent to reflect a depressed market and 10 percent to take into account the forced sale circumstances of property sold under distraint. Because the property was held in joint tenancy, Mr. Corpus divided the discounted value of $172,500 in half, or $86,250. Mr. Corpus then determined that the minimum bid would be $58,000. This was approved by Mr. Corpus' group manager and was not challenged by Mr. Sharp.

Revenue Officer Corpus also prepared a Notice of Encumbrances which also listed the $190,000 first trust deed held by C & M. The Notice of Encumbrances disclaimed the correctness or completeness of the information provided and stated that prospective bidders should verify for themselves the validity, amount, and priority of any encumbrances against the property offered for sale. Mr. Corpus mailed a copy of the Notice of Sealed Bid Sale, the Seizure and Sale Worksheet, the Notice of Encumbrances and a sealed bid form to Mr. Sharp. The sale was then advertised in a local newspaper of general circulation beginning on April 19, 1986. Mr. Corpus also posted notices of sale at various public buildings, including the post office and IRS office in Palm Springs. Mr. Corpus testified that he received some, but not many, inquiries about the sale.

It was at this point that plaintiffs became involved. Mr. Meek was a social acquaintance of Mr. Sharp. A few months prior to these events, he had expressed an interest to Mr. Sharp in purchasing the property if it were about to be sold in a tax sale. Mr. Meek testified that on April 24 or 25, 1986, he received a phone call from Mr. Sharp's secretary, Kitty Cox. According to Mr. Meek, Ms. Cox stated that Mr. Sharp was out of town and that unless Mr. Meek could help put an escrow together by Monday morning, April 28, Mr. Sharp's property would be sold at an IRS sale. Ms. Cox requested that Mr. Meek contact Michael Solomon, an attorney employed by the Los Angeles Group, a company which was helping Mr. Sharp in connection with his tax problems.

When Mr. Meek contacted him, Mr. Solomon claimed that he had talked to the revenue officer involved and that the revenue officer had agreed to stop the tax sale if an escrow was opened by April 28. Mr. Solomon also told Mr. Meek that the purchase price would have to be in excess of $196,000 because there was already a bid on the property for $195,000. At trial Revenue Officer Corpus denied having had any conversation with Mr. Solomon regarding

---

**2.** This deed of trust had been executed by Mr. Sharp and his wife in December of 1980 to secure Mr. Sharp's business debts to C & M.

The deed of trust was recorded on January 8, 1981 and was, therefore, senior to the federal tax liens for 1982–84.

an escrow or the sale of the property. In fact, he had never spoken with Mr. Solomon. Such a conversation would have been contrary to IRS regulations which require that a power-of-attorney be filed with the IRS before an individual's tax situation may be discussed with anyone other than the tax payer. Mr. Corpus also denied giving Mr. Solomon any information regarding bids received on the property. At the close of trial, the Court indicated that it did not find Mr. Solomon's testimony to be credible. However, the court found Mr. Corpus a credible witness. Any theory of recovery based on alleged representations or misrepresentations by Revenue Officer Corpus appears to have been abandoned by plaintiffs.

Based upon his conversations with Mr. Solomon, Mr. Meek decided to open an escrow account. Mr. Meek was familiar with escrow procedures, having purchased parcels of real estate in this manner in the past. Mr. Meek contacted General Escrow Company, with whom he had had prior dealings, and instructed an escrow officer there to open an escrow for the purchase of the property. The documents that were created at the General Escrow Company explicitly referred to an existing loan of record. Mr. Meek did not ask that a preliminary title report be prepared. From past experience, however, Mr. Meek expected that he would receive title in the escrow purchase free and clear of encumbrances. On April 26, 1986, Mr. and Mrs. Meek signed the escrow papers and, plaintiffs claim, had the documents delivered to Mr. Solomon, together with a cashier's check for $20,000. However, Mr. Solomon denied that he had ever received the original documents or the $20,000 deposit. It is undisputed that neither Mr. Solomon nor Mr. Meek mailed the escrow papers to the IRS. On Monday, April 28, Mr. Solomon informed Mr. Meek that the IRS would not stop the tax sale of Mr. Sharp's property. He suggested that Mr. Meek bid on the property at the tax sale. Mr. Meek agreed to this plan. On Tuesday, April 29, Mr. Meek met Mr. Sharp at a local restaurant and obtained an IRS Sealed Bid Form.

The express terms of sale specified on the Sealed Bid Form included that only Mr. Sharp's interest in the property would be sold, subject to prior encumbrances. The form also stated that the property was offered "where is," "as is," and without recourse against the United States. Further, the form indicated that the United States did not guarantee or warrant validity of title or the condition of the property and that no claim for adjustment or rescission would be allowed based on failure of the property to meet any representation, express or implied. The form also stated that the property would be sold to the highest bidder, subject to the taxpayer's redemption right under IRC § 6337 (1986).[3] The successful bidder would receive a Certificate of Sale following full payment of the purchase price. If no redemption occurred, the District Director would issue a deed to the purchaser upon surrender of the certificate of sale.

Mr. Meek did not read the terms on the Sealed Bid Form and testified that he did not know the value of the property. Prior to the tax sale, he did not ask Mr. Solomon, Mr. Sharp or anyone at the IRS about the nature of the property interest he intended to purchase. In addition, Mr. Meek failed to obtain a title examination of the property and he did not read the Notice of Sale, Notice of Encumbrances, or the Seizure and Sale Worksheet. Mr. Meek simply assumed that he was buying the property free and clear and that any superior mortgages on the property would be satisfied with the tax sale proceeds. Moreover, Mr. Meek believed that the IRS would supply title insurance and convey the property by warranty deed. Based upon these assumptions, Mr. Meek entered a signed bid of $225,000 for the property and gave Mr.

---

**3.** Under IRC § 6337(b),

> The owners of any real property sold as provided in section 6335, their heirs, executors, or administrators, or any person having any interest therein, or a lien thereon, or any person in their behalf, shall be permitted to redeem the property sold, or any particular tract of such property at any time within 180 days after the sale thereof.

Sharp a $50,000 deposit to submit with the bid.

The tax sale was conducted on April 30, 1986. Mr. Meek's sealed bid was the only one received. As the bid well exceeded the minimum purchase price and was accompanied by a cashier's check for more than 20 percent of the bid, Mr. Corpus declared Mr. Sharp's property sold to Mr. and Mrs. Meek. At trial, Mr. Corpus testified that the bid was unusually high but he had assumed that Mr. Meek knew something about the property or its location that he did not. Following the sale, Mr. Corpus notified the Meeks of their purchase by mail. Mr. and Mrs. Meek paid the $175,000 balance of the purchase price with borrowed funds secured by certificates of deposit. Following their purchase, the Meeks collected rent payments from the tenants in the Joni Drive building. On May 5, 1986, the Meeks received a Certificate of Sale of the property from Mr. Corpus. The Certificate of Sale provided a 180 day period during which the taxpayer could redeem the property.

Mr. Meek was surprised and dismayed to receive a Certificate of Sale instead of a deed. He had a potential buyer for the property whom he thought would not wait 180 days to purchase it. Upon receiving the Certificate, Mr. Meek had Mr. Sharp's secretary send him the Notice of Sale and any other pertinent IRS documents immediately. This was the first time that he read the terms of sale listed in the Notice. Mr. Meek then telephoned Mr. Corpus to inquire about the redemption period, but raised no other questions about the property he had purchased. Mr. Meek took no other action at that time and left the country on July 15, 1986 for a month's vacation.

On July 26, 1986, Shoshone Service Corporation (Shoshone), trustee under the first deed of trust on the C & M note, issued a notice of intent to foreclose on the Joni Drive Property. Mr. Sharp had fallen be-hind on payments on the note in 1984, and C & M had duly recorded a notice of default on April 14, 1986. Upon return from his vacation, Mr. Meek learned that the Joni Drive property was scheduled to be sold on August 19, 1986 to satisfy the C & M note. Mr. Meek called the IRS and learned that he had purchased the property interest subject to the superior mortgage. He then called Shoshone and was told that the sale could not be cancelled. Mr. Meek took no other action.

The C & M foreclosure sale took place as scheduled, and the IRS was duly notified. The property was purchased by the C & M Defined Benefit Pension Trust, to whom the trust deed had been transferred by C & M. The unpaid balance of the debt secured by the trust deed was calculated at this time at $203,600.32. Mr. Meek then contacted Carl Tiedeman, C & M's president, to ask what it would cost to recover the property. Mr. Tiedeman offered to sell it back to him for $250,000, but Mr. Meek rejected this proposal as too costly. Mr. Meek then met with Dempsey Mork, president of the Los Angeles Group, the Group's lawyers, Mr. Sharp and Mr. Solomon. Mr. Meek then filed claims, through the group's lawyers, against the IRS and Mr. Tiedeman to recover the property or its value. In return for a reduction of $5,000 in attorney fees, Mr. Meek agreed not to pursue any claim against the Los Angeles Group.

The 180 day redemption period following the IRS tax sale expired on October 27, 1986. Plaintiffs did not surrender their Certificate of Sale to the IRS or request a deed to the Joni Drive property. In December 1986, pursuant to IRC § 7425(d) [4], the IRS redeemed the Joni Drive property from the C & M Defined Benefit Pension Trust for $207,726.17. In January 1987, the IRS sold the property to a third party by sealed bid for $285,000, free and clear of all liens and interests.[5]

---

**4.** That section provides:
   In the case of a sale of real property ... to satisfy a lien prior to that of the United States, the Secretary may redeem such property within the period of 120 days from the sale of such sale or the period allowable under local law, whichever is longer.

**5.** The foreclosure sale included the interest of Mrs. Sharp as well so that when the IRS re-

Plaintiffs then brought a wrongful levy action in the United States District Court for the Central District of California, seeking rescission of the tax sale contract and recovery of the purchase price. This suit was dismissed in 1987 for failure to prosecute and comply with court orders. *Barjona J. Meek and Roberta L. Meek v. United States, CV No. 87–00356–WJR(Gx).* On January 5, 1988, plaintiffs asked the IRS for a refund of the purchase price. That request was denied by letter on March 28, 1988. Plaintiffs then filed the instant suit on July 6, 1988.

## DISCUSSION

Plaintiffs present several theories as a basis for recovery in this case. The first is that the unilateral mistake made by Mr. Meek as to the "free and clear" status of the property he purchased makes the contract voidable. The second is that the C & M foreclosure terminated the tax sale contract and, therefore, plaintiffs are entitled to a refund of the purchase price. Finally, plaintiffs argue that the IRS' actions constitute a fifth amendment taking without just compensation. The court will address these theories individually.

### I. Unilateral Mistake

■ Plaintiffs argue that due to the course of dealing which led up to the sealed bid, Mr. Meek reasonably and justifiably believed that the terms of the IRS sale were "free and clear." In support of this argument, plaintiff points to the *Restatement of Contracts, 2nd* Section 153 of the *Restatetement* provides:

When Mistake of One Party Makes A Contract Voidable

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

deemed the property they then owned the entire

a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

b) the other party had reason to know of the mistake or his fault caused the mistake.

Plaintiffs also make several arguments that enforcement would be unconscionable under § 153 and that it is clear that Revenue Officer Corpus must have known and did in fact know that Mr. Meek was operating under some type of mistake.

Section 154 of the *Restatement* sets out 3 instances where a party bears the risk of mistake:

A party bears the risk of a mistake when

a) the risk is allocated to him by agreement of the parties, or

b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

All 3 of the circumstances listed above apply here. If a mistake was made in this case, it was that Mr. Meek did not read the documents. The documents which were sent to Mr. Sharp clearly purport on their face to allocate risk of valuation and condition of title to the buyer. Even the Sealed Bid Form which Mr. Meek signed clearly expresses that the risk is on the bidder. As the Court of Claims commented in *Collins v. United States:*

Ignorance is never sufficient to constitute a ground of relief if it appears that the requisite knowledge might have been obtained by reasonable diligence. He who averts knowledge to himself cannot later claim lack of knowledge.

209 Ct.Cl. 413, 420–21, 532 F.2d 1344, 1348 (1976) (citations omitted).

■ Plaintiffs' second argument is that the amount bid by Mr. Meek was utterly unexplainable unless there was a fundamental misunderstanding about the contract. Consequently, argues plaintiff, property.

Claims Court precedent requires that the IRS revenue officer was under a duty to verify the bid and the terms on which it was presented. Because this did not happen, plaintiffs conclude, the contract is voidable for unilateral mistake.

The precedent cited by plaintiffs comes out of a long line of mistaken bid cases in Claims Court and Court of Claims jurisprudence. Under that precedent, the question is:

> ... whether, even though they could not have known with certainty from the bid data that a mistake had been made, there nevertheless was enough to have reasonably cast upon defendant's officials the duty to make inquiry, which inquiry would have led to the requisite knowledge.

*Wender Presses, Inc. v. United States,* 170 Ct.Cl. 483 at 485–6, 343 F.2d 961 at 962 (1965). Moreover, "where the price bid is so obviously disproportionate to the value of the article as to alert the contracting officer to the strong possibility of error, the contract resulting from the acceptance of the bid is subject to rescission." *Id.* at 488, 343 F.2d at 964.

Plaintiffs' argument here fails for several reasons. First of all, plaintiffs can cite to no cases which have placed a duty to inquire on revenue officers of the IRS. Indeed, IRC § 6335 and Regulation 301.-6335–1(c) require the officer conducting the sale to announce the name of the highest bidder and award the tax sale property to him. It is not clear that Revenue Officer Corpus would even have been allowed to make any inquiry of Mr. Meek based on the size of the bid.

Second, mistaken bid cases usually require clerical or arithmetic errors. Here, plaintiffs argue Mr. Meek was operating under a mistake respecting the existence and legal force of the terms of the tax sale. This is a mistake of judgement or law, not a clerical or arithmetic error.

Finally, assuming there is a duty to inquire in these cases, it did not arise here. The $58,000 amount represented a minimum price below which the property was not to be sold. Mr. Corpus testified that he believed the property was probably worth more than the $400,000 value it had been given two years previously. Mr. Corpus also testified that he thought Mr. Meek might have had some information about the property of which Mr. Corpus was unaware. There was no range of bids which might have made this bid appear disproportionate and it was not so disproportionate as to create an inference of error. Thus, Mr. Corpus neither knew, nor should he have known, that plaintiffs' bid was a mistake.

Moreover, enforcement of this contract would not have been unconscionable. As the Court of Claims explained in *Frass Surgical Mfg. Co. v. United States,* 215 Ct.Cl. 820, 830, 571 F.2d 34, 40 (1978):

> The grant of discretion to deny enforcement to an unconscionable clause ... is not intended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise.

Plaintiffs can hardly claim unfair surprise or oppression where they failed to inquire about the nature of the property interest they were buying, read the contract, or obtain a timely title search. Had plaintiffs done so, they could have profited handsomely. If Mr. Meek had submitted the minimum bid of $58,000 and then bought back the property from C & M for $250,000, plaintiffs would have received a parcel of property worth more than $400,000. Thus, the IRS would have accepted contract terms by which the tax sale purchaser stood to profit almost $100,000. The court will not redistribute the risks plaintiffs undertook by their own failure to read the contract they signed.

## II. The Effect of the C & M Foreclosure upon Plaintiffs Tax Sale Contract

■ Plaintiffs next argue that when an IRS non-judicial tax sale occurs and a prior secured party forecloses during the redemption period, all junior interests (including the taxpayer's equity and the federal tax lien) are extinguished. Thus, argue plaintiffs, the government's duty to convey a deed to the buyer cannot be carried out

and the bidder must receive a refund of his payment. By statute, however, the tax sale bidder bargains for the taxpayer's right, title and interest at the moment that the IRS lien attached. The tax lien attaches at the time the tax is assessed. IRC § 6322. That is, when the tax is written as due and owing on the taxpayer's account. IRC § 6203. In this case, the tax assessments, involving several tax periods, occurred at various dates from 1981 through 1983. At the time that the taxes were assessed and the tax lien attached, the taxpayer had a real, salable, bona fide interest subject to the prior trust deed. Indeed, there appears to have been a real interest of about $80,000 at the time of the tax sale, based upon an assessed fair market value of $400,000 for the whole property.

During the 180–day taxpayer redemption period after a tax sale, the tax sale purchaser holds only a certificate entitling him to receive a deed after the expiration of the redemption period, assuming there is no redemption by the taxpayer. Mere possession of a Certificate of Sale does not pass title. Title does not pass until the expiration of the redemption period. At the time of the tax sale and continuing through the redemption period, title remains vested in the taxpayer. Where the IRS is notified of a foreclosure under state law by a secured party with priority, the federal tax lien is extinguished if local law provides that result for junior interests generally. IRC § 7425(b)(2). Such notice was provided to the IRS here and California law provides for such extinguishment. Cal.Civ.Code § 2492 *et seq.* However, the government does retain a statutory right to redeem. IRC § 7425(d). The IRS may redeem from the senior foreclosing lienholder and recoup its interest in the subject property by re-selling the property after redemption.

In the case at bar, during the 180–day redemption period C & M Defined Benefit Pension Trust, holding an interest senior to the IRS, foreclosed under California's summary nonjudicial foreclosure procedures. This extinguished the tax lien along with the taxpayer's interest and any other junior claims in the process. Thus, plaintiffs argue, the government's tax sale obligations are also extinguished upon redemption. Plaintiffs maintain that this means that at the time of the C & M foreclosure the IRS's power to consummate the tax sale by delivering a deed was terminated. There was no property of the taxpayer which could be deeded by the IRS.

Suppose, plaintiffs hypothesize, that a lien superior to the government's lien foreclosed after the IRS had seized the subject property but before the tax sale could occur. No one would credibly argue that the IRS sale power, which existed at the time of seizure, persisted after the IRS was removed from the picture by the prior lien's foreclosure. The IRS could not hide behind *caveat emptor* to place such a non existent interest up for sale. Plaintiffs argue that the law should provide simple guidance and an equitable result. Where a non-judicial foreclosure has cut off the government's tax lien during the IRS sale redemption period, the tax foreclosure sale should be considered terminated as a matter of law and the tax sale purchaser's money should be refunded.

Plaintiffs argue that the government would be a beneficiary in the long term under such a proposal because the now uncertain legal status of tax sale purchasers in Mr. Meek's situation would be resolved equitably. Plaintiffs assert that the current allegedly uncertain state of the law is a marketplace depressant. Plaintiffs offer a variety of legal characterizations of the condition once the senior lien is foreclosed: the IRS's sales contract is discharged by impossibility or frustration; there is a failure of consideration; there is a simple breach.

Breach has been found in this context in the Claims Court previously. In *Fuentes v. United States*, 14 Cl.Ct. 157 (1987), the government failed to tender a recordable instrument to a tax sale buyer before a prior lien foreclosed. The court in that case, however, held for the government and found that the tax sale purchaser's supervening fault proximately caused the damages. The plaintiff's loss in that case was proximately caused by his failure to cure the delinquent first lien. Plaintiffs'

primary argument is that because of the collapse of the government's power to deliver a deed to the property the contract of sale created at the sealed bid sale was terminated. The parties' duties were thus discharged by supervening impossibility. Thus, it is argued the government owes the Meeks a refund.

Again, plaintiffs point to the *Second Restatement of Contracts* to argue that where a specific thing necessary for the performance of a party's duty is destroyed, that party's obligations are discharged and the opposing party has a right to rescission. Plaintiffs alternatively argue that the contract of sale created at the sealed bid sale was terminated by supervening commercial frustration. According to plaintiffs, under the doctrine of frustration a party's duties are discharged or terminated if an event occurs and the non-occurrence of the event was a basic assumption of the contract. Non-foreclosure, argue plaintiffs, was an event the occurrence of which was a fundamental assumption on which the IRS' sale contract was based. Consequently, the duties of the parties were discharged by supervening impossibility and the plaintiffs have a right of rescission.

Plaintiffs' situation falls between two clear answers. Had Mr. Sharp redeemed his interest within the 180 day period following the tax sale, or if it were determined that the taxpayer had no interest in the property at the time of the sale, plaintiff's purchase price would have been refunded. On the other hand, had C & M foreclosed after the tendering of the deed to plaintiffs, the entire burden would unquestionably have fallen upon the Meeks.[6] Plaintiffs, of course, analogize their interest in the Joni Drive property to the worthless interest of a tax sale purchaser following the taxpayer's exercise of his redemption right. This analogy is imperfect as plaintiffs' interest in the Joni Drive property was made worthless through their own mistake. As explained above, plaintiffs could have profited by almost $100,000 had

they taken the proper steps to investigate the minimum bid acceptable to the IRS. Moreover, IRC regulation 601.104(b)(2) requires that "immediate action" be taken to refund a tax sale purchaser's money if it is determined that the taxpayer had no interest in property sold at the tax sale. This answers plaintiffs' hypothetical quandary about what would happen if the tax sale was held after the taxpayer's interest had already been foreclosed upon.

Plaintiffs ask us to examine the very narrow situation of a foreclosure during the 180–day redemption period, absent any redemption. Here we must look at what the tax sale purchaser bargained for. The tax sale purchaser has an equitable interest in the title held by the taxpayer. Where that taxpayer held title that was subject to a mortgage, the tax sale purchaser holds no more. An examination of the *Restatement* sections cited by plaintiffs provide no aid because they require that there be no fault on the part of the tax sale purchaser. In addition, foreclosure of the property is something that should have been anticipated. The very documents describing the tax sale gave notice that there was a first trust on the property. Thus, the situation here is quite unlike a sale of a non-existent interest or a redemption during the 180 day period. Rather, it is very like the situation where the superior security holder forecloses on the 181st day after the tax sale. And, of course, in that situation the tax sale purchaser would not even have a theoretical argument on this point. The failure to read the documents so as to understand this is what plaintiffs really complain of.

It is hard to imagine what more clear, explicit notice the IRS can give to prevent events like this from occurring. When the tax sale was conducted, the defendant had an interest to sell, which plaintiffs acquired. Plaintiffs subsequently lost the equitable ownership interest at the foreclosure because their equitable interest, derived from Mr. Sharp's legal interest, was conveyed to C & M Defined Pension Bene-

---

**6.** The court notes, however, that plaintiffs never tendered the Certificate of Sale in exchange for

a deed.

fit Trust. The Sealed Bid Form which Mr. Meek signed expressly stated that the successful bidder would receive a Certificate of Sale upon payment of the purchase price, and would be issued a deed only if the purchaser retained equitable ownership at the end of the redemption period. Plaintiffs were clearly warned that they would hold Mr. Sharp's property interest subject to all encumbrances until a deed could be issued. It is only upon the tendering of such a deed that a tax sale purchaser acquires both legal and equitable ownership of the taxpayer's property interest.

## III. Plaintiff's Fifth Amendment Taking Claim

█ Plaintiffs' final argument is that a fifth amendment taking has occurred because the defendant has taken $225,000 of the plaintiffs' money under the pretext of a public sale of real property without ever providing plaintiffs with a deed to the property sold.

In *Shelden v. United States*, 19 Cl.Ct. 247 (1990), this Court indicated six elements which recur in taking caselaw:

First, the government must have invaded or interfered with plaintiff's property.

Second, the government's invasion must have deprived plaintiff of a substantial right or interest in plaintiff's property.

Third, the government's invasion must have been a direct act.

Fourth, the government's invasion of plaintiff's property must be permanent or inevitably recurring.

Fifth, the government's invasion of plaintiff's property must be authorized by Congress.

Sixth, the government must have usurped plaintiff's property to benefit the public.

*Id.* at 251–52 (citations omitted).

A taking requires that the government, through physical intrusion or regulatory impact, has effectively appropriated or invaded property. Defendant argues that there is no showing by plaintiffs of such a governmental interference with plaintiffs' property. The court agrees. The defendant has not interfered with the plaintiffs' purchase money or equitable interest in the property. Plaintiffs voluntarily purchased the tax payer interest at the tax sale. Plaintiffs voluntarily offered to buy the tax payers property "as is" and "where is" at the tax sale at their chosen price. Plaintiffs signed the sealed bid contract signaling acceptance of the terms contained therein and voluntarily paid the IRS a $50,000 deposit on the purchase. When they received the news that they had been successful, plaintiffs voluntarily paid the balance of the purchase price. Defendant's exercise of its rights of redemption and sale of the redeemed property were not in derogation of, but consistent with traditional property rights and the law of secured transactions. Plaintiffs' problem stems from the limited right they voluntarily purchased, not any interference with it. Thus, the court need not analyze any of the other aspects of taking law.

In accepting plaintiffs offer to purchase, defendant has not deprived plaintiffs of their interest in the $225,000. In return for their money, plaintiffs were entitled to receive and did receive a Certificate of Sale evidencing full equitable ownership of the tax payer's interest in the property. The fact that the newly purchased property was not worth nearly what they paid for it is unfortunate. The fifth amendment, however, provides plaintiffs no remedy. Plaintiffs' loss of their interest was a result of the foreclosure of a superior lien and not the result of the IRS' use of governmental power. To the extent that plaintiffs have "unfairly" or "unjustly" lost property, it has been the result of Mr. Sharp's and perhaps the Los Angeles Group's unfair dealing, as well as the Meeks' own failure to make proper inquiry. The United States has not shared in any fault, and may not be held to any blame.

## CONCLUSION

Plaintiffs have failed to show any basis for recovery of their payment of $225,000 to the IRS. Plaintiffs are not entitled to recover because of a unilateral mistake on

their part, nor because of any alleged failure of the Revenue Officer to inquire as to their belief about what they were purchasing. There is also no basis for recovery under any theory related to a failure of consideration or frustration of purpose. Further, the loss was due to a failure on the part of the plaintiffs' to first make inquiry as to what they were purchasing. Finally, there is no basis for finding a fifth amendment taking here.

The Clerk shall enter judgement for the defendant. No costs.